[No. 32967-1-II. Division Two. February 28, 2006.]

CINGULAR WIRELESS, L.L.C., *Appellant*, v. THURSTON COUNTY, *Respondent*.

---

758

*Amit D. Ranade* and *Paul J. Lawrence* (of *Preston Gates & Ellis, L.L.P.*), for appellant.

*William D. Kamerrer* (of *Law, Lyman, Daniel, Kamerrer & Bogdanovich*) and *Edward G. Holm, Prosecuting Attorney*, and *Jeff Fancher, Deputy*, for respondent.

¶1 HOUGHTON, J. — Cingular Wireless, L.L.C., sought a special use permit to erect a cell phone tower in a rural residential area. A hearing examiner denied the permit, and the Board of County Commissioners, with some modifications, affirmed the hearing examiner. Cingular appealed to the superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, and the court denied the petition.

¶2 Cingular appeals, arguing that (1) the hearing examiner improperly applied general standards from the county's comprehensive plan rather than applying only specific county code provisions, (2) the determination that the tower would have an "undue" adverse impact contravenes the Federal Telecommunications Act (TCA), 47 U.S.C. § 332(c), and (3) substantial evidence does not support the hearing examiner's decision.

¶3 Because, under these facts, both the general standards and specific regulations on cell phone towers apply, federal law does not apply, and substantial evidence supports the decision, we affirm.

## I. FACTS

¶4 Cingular applied for a special use permit to erect a cellular antenna tower or wireless communications facility (WCF) at a site in an Olympia rural residential area. Following an evaluation of the proposed project, the Thurston County Planning Department issued a mitigated determination of nonsignificance (MDNS)[1] and recommended issuance of the special use permit, subject to conditions.

¶5 Area residents appealed the MDNS under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. Following a public hearing to consider both the SEPA appeal and the special use permit application, a hearing examiner affirmed the MDNS, but he denied the special use permit. Cingular appealed to the Thurston County Board of Commissioners (Board) which, with slight modifications,

---

[1] A MDNS is a decision that a proposal is not likely to have a significant environmental impact, as mitigated by specified measures. WAC 197-11-734, -766.

affirmed the hearing examiner.[2] Cingular then appealed to federal court, under both the TCA, and the LUPA. The federal court declined to exercise supplemental jurisdiction over the state law claims and stayed the federal claims. Cingular then appealed the Board's decision to the superior court under LUPA, but the court denied the petition.

¶6 Cingular wants to erect the WCF to close a coverage gap in its Personal Communications Services (PCS)[3] network. Currently, the two to three square mile coverage gap includes portions of the main north/south road along the eastern side of Budd Inlet in northeastern Olympia. Cingular customers do not have reliable service within this coverage gap. Thus, the Cingular system drops calls as customers pass through the area. Cingular's Federal Communications Commission (FCC) license obliges it to "build out" its PCS network in order to close such coverage gaps.

¶7 Cingular proposes to build a 150-foot freestanding monopole WCF, with a three antennae array, each with two flat panel antennas. The proposed site lies within an area of northeastern Olympia known as Boston Harbor, which is zoned rural residential, with one home per two acres.

¶8 The primary uses allowed in the zone include agriculture, single family homes, and home businesses. Thurston County Code (TCC) 20.10.020.[4] The TCC permits a WCF as a special use, subject to chapter 20.54 TCC, which estab-

---

[2] Under the county zoning code, hearing examiner decisions are appealable to the Board. Thurston County Code (TCC) 20.60.060(2). The Board limits its review to the evidence presented to the hearing examiner. TCC 2.06.080(C). The Board may adopt, amend, reject, or reverse the hearing examiner's conclusions of law and decision or remand for further consideration. TCC 2.06.080(D). But the hearing examiner remains the fact finder.

[3] A PCS consists of a honeycomb of cell towers. A signal is strongest close to the tower and grows weaker with distance. The system automatically hands off cellular calls from one facility to another as a caller moves around. A coverage gap exists when there is insufficient overlap in the effective range of towers so that calls cannot be made or are dropped.

[4] All citations are to the 2002 version of the county code. As noted, in making its arguments, Cingular repeatedly, and sometimes misleadingly, quotes the current version.

lishes both general and specific standards that must be met before a special use may be permitted.

¶9 The general standards provide that: (1) the proposed use "shall comply with the Thurston County Comprehensive Plan and all applicable federal, state, regional, and Thurston County laws or plans"; (2) the proposed use "shall comply with the general purposes and intent of the applicable zoning district regulations and subarea plans"; and (3) "[n]o application for a special use shall be approved unless a specific finding is made that the proposed special use is appropriate in the location for which it is proposed." TCC 20.54.040. The latter finding must be based on a determination that "[t]he proposed use shall not result in substantial or undue adverse effects on adjacent property, neighborhood character, natural environment, traffic conditions, parking, public property or facilities, or other matters affecting the public health, safety and welfare." TCC 20.54.040(3)(a).

¶10 The TCC also establishes specific standards for 45 particular special uses, including WCFs, which apply "in addition to" the general standards. TCC 20.54.070, .070.44.3, .070.44.6, .070.44.8. Chapter 20.33 TCC[5] sets forth the specific WCF standards. In particular, WCF

---

[5] Of importance to our analysis, we note that Cingular and Thurston County appended inapplicable current versions of chapter 20.33 TCC to their briefs. Cingular bases some of its arguments on this inapplicable code.

The applicable code substantially differs from the current version. Thurston County adopted the current version in November 2003, repealing the version in effect when Cingular filed its application. The current WCF section specifies stricter and more particularized design standards than those in effect at the time of this land use decision.

Throughout its brief, Cingular emphasizes the hearing examiner's finding that it had met the specific WCF design standards. But the design standards the hearing examiner found were met are not the same as those quoted by Cingular in its briefing.

For example, the applicable version includes a "specific" standard for "siting": "Significant visual impacts of a WCF, from the front and rear of any residence on adjacent properties and for any residence across the roadway from the WCF, shall be minimized to the maximum extent feasible through careful siting." TCC 20.33.080(5). In contrast to the applicable standard for "careful siting," the current inapplicable "siting" standard comprises well over one thousand words.

Under the current standards, freestanding WCFs are not permitted in residential districts (including the one at issue here) unless there is no available or

design standards are codified in TCC 20.33.080 and cover 10 categories: height, setbacks, colocation with other providers, separation, siting/screening/camouflaging, security, parking/access, signals, outdoor storage, and noise.

¶11 The hearing examiner found that Cingular's proposed use met the specific TCC 20.33.080 WCF design standards. Then, based on testimony and evidence presented by area residents, the hearing examiner found that the project would not be appropriate in the proposed location. Accordingly, the hearing examiner concluded that the permit should be denied because it did not comport with the general standards.

¶12 At the public hearing, 22 area residents testified, voicing concerns about the aesthetic, environmental, and health impacts of the proposed WCF. In addition, about 150 citizens signed a petition opposing the permit.

¶13 Several citizens voiced concerns about the adverse health impacts of radiofrequency (RF) emissions, including increased risk of cancer. Because the TCA expressly prohibits local officials from basing land use decisions on fears about RF emissions when proposed WCFs comply with FCC RF exposure limits, and because the proposed WCF complied with such limits, the hearing examiner did not consider this testimony.

¶14 Citizen concerns about environmental effects focused on the adverse effect on birds and other wildlife, salmon in nearby streams, and groundwater contamination. But the hearing examiner determined that the pro-

feasible site in a nonresidential district and the denial of a permit would "have the effect of prohibiting the provision of personal wireless communication service." TCC 20.33.080(2)(a). Also, WCFs must be located in areas where their "visual impact is least detrimental to views of recognized landmarks, such as . . . Mount Rainier." TCC 20.33.080(2)(b)(i). A proposed use that has a significant detrimental impact on such landmarks must be denied unless an applicant demonstrates that a site with less impact is not available.

Had the hearing examiner denied the special use permit after finding that Cingular met the current more exacting standards, Cingular's argument that the hearing examiner erred by relying on the general standards might have more merit because it would then appear that the general standards are inconsistent with the specific ones. But that is not the case before us.

posed WCF met guidelines issued by the United States Fish and Wildlife Service. Moreover, the Washington Department of Fish and Wildlife found the project would have no adverse impact. The hearing examiner determined that the adverse environmental impacts were aesthetic.

¶15 To support its request, Cingular submitted 10 balloon photographs, taken from various vantage points. In four of the photographs, a digital monopole tower is superimposed over the site to simulate the visual effect of the WCF. Some residents objected to the balloon photographs because they do not depict views from one of the neighborhoods that the WCF would impact.

¶16 Cingular wanted to place the WCF on a 1,600 square foot site it leased within a 3.25 acre parcel that had been donated to the North Thurston County Fire District for community use and recreational purposes. A fire station currently sits on the property. Also, about 150 feet from the proposed WCF site, there is a park with a picnic area, volleyball court, and playground. Residents use the park for weddings, picnics, and family gatherings.

¶17 Finding of fact 13 states:

> The Appellants and other residents objected to the proposal on the basis of aesthetic and environmental impacts. The surrounding rural neighborhood enjoys vistas of farmland and Mt. Rainier. One of the primary aesthetic impacts identified by residents is the obstruction of their Mt. Rainier view corridor. Residents submitted that the site is on a migration route for songbirds. The subject property is near the Nisqually National Wildlife Refuge, and there are large conservation parcels to the west and north of the site. The businesses in the neighborhood are family owned and operated. The types of businesses include horse boarding, gardening and auto repair (home-based). The residents are committed to upholding the character of the neighborhood.

Administrative Record (AR) at 40.

¶18 Based on these findings, the hearing examiner concluded that the project conflicts with the comprehensive

plan's policy to "locate private utility facilities near compatible land uses as defined in the County's Special Use standards." AR at 51. The hearing examiner also concluded that the project would not comply with the purpose and intent of the zoning district, which is to "enhance and preserve the rural agricultural character in areas where there is currently little development." AR at 51.

¶19 Finally, the hearing examiner concluded:

> Based on the credible (and voluminous) testimony and evidence of the surrounding residents, the facility would have an undue adverse effect on neighborhood character. The neighborhood is marked by scenic vistas of farmland and Mt. Rainier, home-based businesses, outdoor recreational opportunities, and abundant wildlife. A 150-foot tall monopole tower would detract from these features and aesthetic environment. Such an effect is "undue" per TCC 20.54.040(3)(a) because the neighborhood is served by wireless services. Although the Applicant provided credible evidence that Cingular has a coverage gap for in-vehicle and in-home service in the area of the proposed WCF, the Applicant did not identify any laws or regulations that would require Thurston County to fill every such coverage gap, particularly when, as here, the facility would detract from the character of a unique neighborhood. No evidence was provided that the FCC mandates seamless in-vehicle or in-home coverage. Even if such coverage were required, the Applicant is not precluded from seeking a more appropriate site from which to provide such coverage.

AR at 53.

¶20 On appeal of the hearing examiner's decision, the Board affirmed, stating that "the proposed WCF will have a looming presence over the adjacent community area that historically has been used for recreational and community purposes." AR at 2917. The Board added the modifier "substantially" to the hearing examiner's conclusion that the WCF would "detract from these features and aesthetic environment." AR at 2917. The Board crossed out the sentence that the WCF's adverse effect would be "undue" because the neighborhood is served by wireless services and substituted the following:

Furthermore, the proposed cell tower is not providing an overriding public benefit because the neighborhood is currently served by wireless services. If the proposed cell tower was providing coverage in an area that did not otherwise have coverage then the county could pursuant to TCC 20.54-.040(3)(a) allow the special use permit in spite of the identified undue adverse effects. However, that is not the case here.

AR at 2917.

¶21 On appeal to the superior court, the court denied the LUPA petition, agreeing with the Board that the hearing examiner could properly reject the special use permit based on the TCC's general standards, even though Cingular met the specific WCF requirements. In particular, the court agreed that the TCC 20.54.040 general standards must be met in addition to the chapter 20.33 TCC specific standards.

¶22 Cingular appeals.

## II. ANALYSIS

### A. STANDARD OF REVIEW

¶23 LUPA governs judicial review of land use decisions. Under LUPA, we "stand[ ] in the shoes of the superior court and review[ ] the hearing examiner's action on the basis of the administrative record." *Pavlina v. City of Vancouver*, 122 Wn. App. 520, 525, 94 P.3d 366 (2004). A court may grant relief on a land use decision only if the party seeking relief has carried the burden of establishing that one of the following standards is met:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).

¶24 Standards (a), (b), (e), and (f) present questions of law we review de novo. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 468, 61 P.3d 1141 (2003). Standard (c) concerns a factual determination that we review for substantial evidence supporting it. *Freeburg v. City of Seattle*, 71 Wn. App. 367, 371, 859 P.2d 610 (1993).

¶25 Substantial evidence is evidence that would persuade a fair-minded person of the truth of the statement asserted. *Freeburg*, 71 Wn. App. at 371. Our deferential review requires us to consider all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority. *Freeburg*, 71 Wn. App. at 371-72. Here, that was the hearing examiner.[6]

¶26 The clearly erroneous standard (d) test involves applying the law to the facts. *Citizens To Preserve Pioneer Park, L.L.C. v. City of Mercer Island*, 106 Wn. App. 461, 473, 24 P.3d 1079 (2001). Under that test, we determine whether we are left with a definite and firm conviction that a mistake has been committed. *Citizens To Preserve*, 106 Wn. App. at 473. Again, we defer to factual determinations made by the highest forum below that exercised fact-finding authority. *Citizens To Preserve*, 106 Wn. App. at 473.

---

[6] *See* note 2, *supra*.

## B. CINGULAR'S ERROR OF LAW ARGUMENTS

### 1. Application of TCC 20.54.040

¶27 Cingular first contends that the hearing examiner erroneously interpreted the law and violated subsection (b) of RCW 36.70C.130(1) in rejecting the special use permit because he based his decision on the TCC's general standards. Cingular argues that when it satisfied the specific WCF standards, it fulfilled all special permit requirements for WCFs.

¶28 Cingular's first error of law argument, which we review de novo, comprises four parts. More specifically, Cingular contends that the hearing examiner (1) improperly interpreted applicable law, (2) incorrectly applied the law, (3) incorrectly construed the law, and (4) denied Cingular its due process and equal protection rights.

### a. Comprehensive Plan and Specific Zoning Ordinances

¶29 First, Cingular argues that the hearing examiner improperly elevated the county's comprehensive plan over specific zoning ordinances. Cingular cites *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 947 P.2d 1208 (1997), for support.

¶30 In *Citizens for Mount Vernon*, that city approved a commercial planned unit development based on its conformity with Mount Vernon's recently adopted comprehensive plan, even though preexisting specific zoning ordinances prohibited the proposed use. The superior court reversed the city and our Supreme Court affirmed, holding that a comprehensive plan, standing alone, cannot be used to make specific land use decisions. *Citizens for Mount Vernon*, 133 Wn.2d at 873. Where there are conflicts between a general comprehensive plan and a specific zoning code, the conflicts must be resolved in the zoning code's favor. *Citizens for Mount Vernon*, 133 Wn.2d at 874.

¶31 Cingular argues that the decision here is contrary to *Citizens for Mount Vernon* because the hearing examiner

relied on the comprehensive plan even though Cingular met specific TCC requirements. Cingular misplaces its reliance on *Citizens for Mount Vernon*.

■■ ¶32 To the extent a comprehensive plan prohibits a use that the zoning code permits, the use is permitted. *Lakeside Indus. v. Thurston County*, 119 Wn. App. 886, 895, 83 P.3d 433, *review denied*, 152 Wn.2d 1015 (2004). But where, as here, the zoning code itself expressly requires that a proposed use comply with a comprehensive plan, the proposed use must satisfy both the zoning code and the comprehensive plan. *Lakeside*, 119 Wn. App at 895 (citing *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 43, 873 P.2d 498 (1994) (citing *Cougar Mountain Assocs. v. King County*, 111 Wn.2d 742, 757, 765 P.2d 264 (1988))); *see also W. Main Assocs. v. City of Bellevue*, 49 Wn. App. 513, 524-25, 742 P.2d 1266 (1987) (noting that comprehensive plans can be given regulatory effect through enactment, in whole or part, as a regulation or ordinance), *review denied*, 112 Wn.2d 1009 (1989).

¶33 In *Lakeside*, we reviewed the county's denial of a special use permit for asphalt manufacturing within the Nisqually Valley. As in this case, the proposed use met the specific standards for that particular use as set forth in TCC 20.54.070, but the county board reversed the hearing examiner and denied the permit because the proposal failed to meet the county's general standards under TCC 20.54.040. *Lakeside*, 119 Wn. App. at 892-93. The county board concluded that the proposed use conflicted with the Nisqually subarea plan, contrary to TCC 20.54.040(1). *Lakeside*, 119 Wn. App. at 892, 895.

¶34 More specifically, the county board, sitting as an appellate body, accepted the hearing examiner's findings of fact, including his determination that the proposed use would have no adverse effect on a range of "sensitive areas," including groundwater, drainage, traffic, flooding, noise, and air quality. *Lakeside*, 119 Wn. App. at 897. But after accepting those findings, the county board reversed the

hearing examiner, invoking the subarea plan's general purpose statements to deny the permit.

¶35 On appeal, we disagreed that the proposed use conflicted with the Nisqually subarea plan and, thus, we reversed and held that the proposed use properly complied with both the general and the specific standards of the special use permit code provisions. *Lakeside*, 119 Wn. App. at 897. Although we reversed the county board's action and reinstated the hearing examiner's decision, we implicitly agreed that a county could require compliance with both general and specific standards for proposed special uses. The circumstances before us differ from those in *Lakeside* because here the hearing examiner found that the proposed use would have specific adverse effects and, thus, did not meet both the general and specific requirements.

¶36 Although Cingular's briefing did not include any discussion of *Lakeside*, at argument before this court Cingular relied on it for the proposition that "the Board may not invoke the plan's general purpose statements to overrule the specific authority granted by the zoning code." 119 Wn. App. at 898-99. In *Lakeside*, we cited *Sunderland Family Treatment Services v. City of Pasco*, 127 Wn.2d 782, 796-97, 903 P.2d 986 (1995), and reversed because the county board decision "violates the rule that specific zoning laws control over general purpose growth management statements and fails to provide meaningful standards for review of a county decision to deny a permit." *Lakeside*, 119 Wn. App. at 898.

¶37 We referred to that statutory construction principle based on the particular facts presented in *Lakeside*. There, the subarea plan itself contained both specific and general provisions: although it generally prohibited new large-scale, commercial development, it specifically identified the mine in question as an existing permitted mining operation. When the Board invoked the subarea plan's general policy against new industrial development in order to deny the permit, it created a conflict between the subarea plan's general policy statement and its specific authorization for

the existing mine. We held that such a conflict must be resolved in favor of the specific authorization.

¶38 Further, in *Lakeside*, the county board failed to identify any factual findings in support of its decision. Instead, the hearing examiner's findings indicated that the project met all relevant zoning code provisions, both general and specific. The situation differs here. The hearing examiner's findings identify specific adverse effects on the neighborhood character. Based on those findings, the Board affirmed the hearing examiner. The Board noted that a community recreational area was just 150 feet from the site, the WCF would create "visual pollution" in the adjacent Cushman area neighborhood and obstruct the neighborhood's Mount Rainier view corridor, a number of significant trees would be removed, and the WCF would "have a looming presence over the adjacent community area that historically has been used for recreational and community purposes." AR at 2916-17.

¶39 Unlike in *Lakeside*, here the county board's decision was consistent with the facts found by the hearing examiner and grounded in a factually specific consideration of the suitability of the particular site for the proposed project.

¶40 Continuing our discussion, we note that state law does not require that a county adopt specific standards; rather, it may adopt general standards in its comprehensive plan, so long as they are adequate. For example, in *Sunderland* the court found such general standards inadequate where the municipal code allowed special permits on a case-by-case basis but without further elaboration of the applicable standards.

¶41 Here, the county's general standards contain the specificity lacking in *Sunderland*. Likewise, as noted, the facts here differ from those in *Lakeside*, where the county board engaged in the sort of ad hoc decisionmaking rejected in *Sunderland* by asserting its prerogative to make a "case by case" determination of permitted uses within the Nisqually basin, even though the subarea plan itself spe-

cifically identified the mine at issue as a permitted use. *Lakeside*, 119 Wn. App. at 898.

¶42 Because here the comprehensive plan is not inconsistent with the specific zoning code, the county properly requires a proposed WCF to satisfy both the comprehensive plan, as enacted in chapter 20.54 TCC, and the specific standards for WCFs, set forth in chapter 20.33 TCC. Thus, we reject Cingular's argument that the county improperly elevated the comprehensive plan over specific zoning ordinances.[7]

b. Special Use Standards

¶43 Second, Cingular argues that the hearing examiner erred in applying the comprehensive plan because the plan defers to the specific special use standards to determine whether a use is compatible. We disagree that the hearing examiner failed to apply the appropriate special use standards.

¶44 The comprehensive plan includes a policy to "locate private utilities facilities near compatible land uses as defined in the county's Special Use standards." (Thurston County Comprehensive Plan, Utilities, at 7-13). Cingular

---

[7] In a statement of additional authorities, Cingular cites our Supreme Court's recent decision, *Viking Properties v. Holm*, 155 Wn.2d 112, 118 P.3d 322 (2005). *Viking* involved a private restrictive covenant limiting development to one home per one-half acre. The appellant argued that the covenant was void because it was contrary to the Growth Management Act's (GMA), chapter 36.70A RCW, public policy preference for concentrated growth within urban areas.

The court rejected the argument, holding that the GMA is merely a framework that guides land use planning but does not directly regulate site-specific activities. "Instead, it is local development regulations, including zoning regulations enacted pursuant to a comprehensive plan, which act as a constraint on individual landowners." *Viking*, 155 Wn.2d at 126 (citing *Cougar Mountain Assocs.*, 111 Wn.2d at 757 (King County could not deny a development permit based on lack of compliance with comprehensive plan when the zoning code permitted the proposed use)).

Cingular offers *Viking* as additional authority "on the role of comprehensive plans with respect to individual land use decisions." Statement of Additional Authorities at 2. *Viking* adds no additional support to Cingular's arguments. It does not alter the rule that local authorities may give regulatory effect to comprehensive plan provisions by specifically incorporating them into zoning ordinances, as the county did in this case.

argues that this requires the hearing examiner to rely solely on the *specific* standards of chapter 20.33 TCC to determine whether a use is "compatible."

¶45 Cingular's argument ignores that the "Special Use standards" referred to by the comprehensive plan include *both* specific *and* general standards. Among the general standards is that the proposed special use be "appropriate in the location for which it is proposed," as determined by whether the special use will have an undue adverse impact on the neighborhood character or impose an undue burden on preexisting services. TCC 20.54.040(3). In determining that the proposed WCF was contrary to the comprehensive plan's utilities policy, the hearing examiner based his decision on finding that the WCF failed to meet this general standard contained in the special use code provision. Thus, Cingular's argument lacks merit.

### c. Specific and General Standards

¶46 Third, Cingular argues that because one of the purposes of the specific standards is to protect neighborhood character, the specific standards control in deciding whether a proposed WCF satisfies the general standard that a special use must be appropriate for a particular location.[8] In making this argument, Cingular relies on the rule of statutory construction that where one statute deals with a subject in general terms and another deals with the same subject in a more detailed way, the two should be harmonized if possible and, if there is any conflict, the specific prevails over the general absent a contrary legislative intent. *Higbee v. Shorewood Osteopathic Hosp.*, 105

---

[8] Cingular quotes the current chapter 20.33 TCC purpose statement, which specifically states a purpose to protect "neighborhood character." Appellant's Br. at 15, Appellant's Reply Br. at 11. Because one of TCC 20.54.040's general standards requires there be no undue adverse impact on "neighborhood character," Cingular argues that the more specific standards were intended to control the determination of whether the general standard is met. But this is an instance where Cingular's presentation of the current code, rather than the applicable code, misleads. The version that controls this land use decision states a more general purpose to protect " 'residential areas and other land uses from potential adverse impacts of WCFs.' " AR at 2442 (quoting TCC 20.33.010(2)).

Wn.2d 33, 37, 711 P.2d 306 (1985) (harmonizing special survival statute with general survival statute); *Pannell v. Thompson*, 91 Wn.2d 591, 597, 589 P.2d 1235 (1979) (specific spending limitation of $6,090,000 prevails over general authorization to make expenditures and general prohibition on reductions in the Department of Social and Health Services spending program).

¶47 Even if there were a conflict between the specific and the general provisions, the TCC clearly expresses the intent that a use be denied unless both special and general provisions are met. TCC 20.03.040 ("Even if a proposed special use meets all the special standards for that particular use, the use must also meet the general standards of this title for special uses, and shall be denied if the special and general standards are not met."); TCC 20.54.030 (A special use must comply with both specific requirements "and those of other applicable chapters of this title."); TCC 20.54.040 ("In addition to the specific standards set forth hereinafter with regard to particular special uses, all uses authorized as special uses shall meet the following standards."); TCC 20.54.070 (specific standards for particular uses apply "in addition to" those established elsewhere in the code).

¶48 Moreover, no conflict exists between the general standards of chapter 20.54 TCC and the specific WCF regulations in chapter 20.33 TCC. The specific standards do not permit what the general ones forbid, or vice versa. Rather, the general standards complement the specific ones.

¶49 Chapter 20.33 TCC's specific design standards apply to WCFs throughout the county. Some of the design standards distinguish between WCFs within and outside urban growth areas, but most do not. Apart from a general prohibition on WCFs at residences, historical sites, and

critical areas, the design standards do not make distinctions based on zoning district or particular location.[9]

¶50 The specific design standard related to "siting" provides: "Significant visual impacts of a WCF, from the front and rear of any residence on adjacent properties and for any residence across the roadway from the WCF, shall be minimized to the maximum extent feasible through careful siting." TCC 20.33.080(5). The TCC further provides that the visual impact of a WCF be minimized through appropriate use of color and screening by trees and vegetation. TCC 20.33.080(5)(b)-(c). The hearing examiner determined that the WCF would not be appropriate for the proposed location even though Cingular met the specific design criteria of chapter 20.33 TCC.

¶51 Were we to accept Cingular's argument that the specific design criteria control whether a proposal meets the general requirement that it is appropriate for the location, there would be no basis to reject a 150-foot WCF proposed for the middle of a high density residential area that obviously obstructed water or mountain views, so long as it was painted in neutral colors and encircled by newly planted 6-foot trees. Depending on the particular location, minimizing the visual impact "to the maximum extent feasible" may or may not meaningfully protect "neighborhood character." TCC 20.33.010(3). At particular locations, it may not be feasible to significantly minimize the visual impact of a WCF. The general standards supplement the specific ones by permitting the county to take into account the nature of the particular site in evaluating a proposal's impact.

¶52 Cingular would have us view the WCF design standards as elaborations of "generic" general standards, just as specific development regulations implement the general policies of a comprehensive plan. The design standards are more aptly characterized as generic WCF regulations that

---

[9] At argument, the county's counsel explained that the specific design standards comprise "measurable" criteria for the WCF structure and the general siting standards comprise "location" criteria.

apply regardless of a WCF's particular location. The special use permit code's general standards supplement the WCF regulations by providing additional criteria to determine the appropriateness of a WCF at a particular location. The general standards of TCC 20.54.040 apply independently of, and parallel with, the specific standards of chapter 20.33 TCC. Thus, Cingular's statutory construction argument fails.

### d. Constitutional Due Process and Equal Protection Rights

¶53 Fourth, Cingular argues that applying the general standards to deny the permit despite compliance with the specific standards violates Cingular's constitutional rights to due process and equal protection. Cingular argues unconstitutional vagueness.

¶54 An ordinance is unconstitutionally vague if it regulates action in terms so vague that persons of ordinary intelligence must guess at its meaning. *Anderson v. City of Issaquah*, 70 Wn. App. 64, 75, 851 P.2d 744 (1993). In the land use area, we look not only at the face of the ordinance but also at how it applies to the person who has sought to comply with the ordinance and/or who is alleged to have failed to comply. *Anderson*, 70 Wn. App. at 75. Zoning ordinances must be specific enough to limit arbitrary and discretionary enforcement of the law. *Anderson*, 70 Wn. App. at 75.

¶55 Cingular relies on *Anderson* to support its contention that the vague general standards fail to guide the hearing examiner's consideration of its permit application. In *Anderson*, the city denied a building permit for lack of compliance with its aesthetic design standards. The design standards required that buildings be "compatible" with adjacent structures and have "appropriate proportions," with "harmonious" colors and fixtures, while avoiding "monotony" of design. *Anderson*, 70 Wn. App. at 67. At multiple public hearings, members of the development

commission repeatedly sent the developer "back to the drawing board" after voicing generalized personal dissatisfaction with the project design. The *Anderson* court held that the city's aesthetic design standards were unconstitutionally vague because they provided so little guidance that officials were left to rely on their own, individual, subjective feelings about whether the proposed design met the requirements. 70 Wn. App. at 76.

¶56 Cingular likens the county's general special use permit standards to Issaquah's aesthetic standards. In Cingular's view, the county's general standards leave officials to rely on their subjective feelings about whether a WCF is appropriate in its proposed location. We disagree.

¶57 In *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Associates*, 151 Wn.2d 279, 87 P.3d 1176 (2004), our Supreme Court rejected a similar challenge to a land use decision based on 14 "design concepts" for a Spokane neighborhood plan, included within the city's comprehensive plan. Although the city had not yet adopted specific development regulations, it approved a rezone application based on conformity with the design concepts of the neighborhood plan. The Court of Appeals reversed, holding that the design concepts were too vague to provide adequate guidance to land use planners, likening the decision to the ad hoc decisionmaking in *Anderson. Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Associates*, 115 Wn. App. 611, 62 P.3d 938 (2003).

¶58 Our Supreme Court reversed the Court of Appeals and reinstated the city's decision. The Court distinguished *Anderson* because it involved "an extremely vague building review process" and the design standards were more general than the design concepts at issue in *Pinecrest*, and because the design concepts did not stand alone but were considered along with other zoning ordinances. *Pinecrest*, 151 Wn.2d at 293.

¶59 The situation here is more similar to *Pinecrest* than to *Anderson*. Cingular had notice from the outset that it must comply with both specific and general standards.

Cingular suggests that the hearing examiner unfairly shifted the ground for his decision from the specific regulations to the general standards. Yet, as noted above, the TCC clearly states in multiple provisions that proposed special uses are subject to both general and specific standards. And, as noted before, our state law does not require specific standards but only general standards such as those contained in a comprehensive plan. *Sunderland*, 127 Wn.2d at 797. The general standards here are far more precise than the vague, free-floating aesthetic standards in *Anderson* or the standardless "case-by-case" determination in *Sunderland*. Cingular's constitutional challenge fails.

### 2. Consideration of Existing Wireless Coverage To Find "Undue" Adverse Effect

¶60 Cingular next contends that the hearing examiner also committed an error of law in deciding that because wireless coverage is already available through other providers, the adverse effect of the proposed WCF would be "undue." Appellant's Br. at 19. Cingular argues that this is contrary to the TCA, which requires local officials to cooperate with wireless service providers to close coverage gaps on their own networks, regardless of whether other providers service the area.

¶61 The hearing examiner concluded that "[b]ased on the credible (and voluminous) testimony and evidence of the surrounding residents, the facility would have an undue adverse effect on neighborhood character. . . . Such an effect is 'undue' per TCC 20.54.040(3)(a) because the neighborhood is served by wireless services." AR at 52.

¶62 The Board had authority to revise the hearing examiner's conclusions, and it did so. TCC 2.06.080(D). The Board crossed out the second sentence (beginning "such an effect") and substituted the following language:

Furthermore, the proposed cell tower is not providing an overriding public benefit because the neighborhood is current-

ly served by wireless services. If the proposed cell tower was providing coverage in an area that did not otherwisehave coverage then the county could pursuant to TCC 20-.54.040(3)(a) allow the special use permit in spite of the identified undue adverse effects. However, that is not the case here.

AR at 2917.

¶63 The Board's language clarifies that the availability of coverage through other providers was a relevant consideration only after the hearing examiner concluded that the proposed WCF would have an "undue adverse effect" on neighborhood character. On finding that the WCF would have such an undue adverse effect, the hearing examiner could have approved the permit if he had found that the WCF would provide an "overriding public benefit":

> The proposed use shall not result in substantial or undue adverse effects on adjacent property, neighborhood character, natural environment, traffic conditions, parking, public property or facilities, or other matters affecting the public health, safety and welfare. However, if the proposed use is a public facility or utility deemed to be of overriding public benefit, and if measures are taken and conditions imposed to mitigate adverse effects to the extent reasonably possible, the permit may be granted even though the adverse effects may occur.

TCC 20.54.040(3)(a).

¶64 The Board considered the availability of coverage through other providers as relevant to the question of whether the WCF would provide an "overriding public benefit" that could support approval despite its substantial or undue adverse effects. The determination that the WCF would have an undue adverse effect was based on the direct impacts of the proposed WCF and not on whether other providers serviced the area.

¶65 Once the hearing examiner determined that the WCF would have a substantial adverse effect on neighborhood character, it had no obligation, under the TCA, to

approve the permit, unless failure to do so would result in an "effective prohibition" of cellular service in the area. 47 U.S.C. § 332(c)(7)(A), (B)(i)(I)-(II).

### C. CINGULAR'S ARGUMENTS BASED ON LACK OF EVIDENCE

#### 1. Substantial Evidence

¶66 Cingular further contends that substantial evidence does not support the hearing examiner's decision to deny the special use permit. Cingular asserts that it "enjoys a presumption" that its proposal is compatible with the neighborhood because chapter 20.33 TCC aims to protect neighborhood character, and Cingular has satisfied all elements of that section. Appellant's Br. at 22.

¶67 In support, Cingular cites to the second edition of *American Jurisprudence, Second Edition*. That source undermines Cingular's position. 83 AM. JUR. 2D *Zoning and Planning* § 893 (2003) (noting that some jurisdictions, including our state, allow denial of a special use permit for incompatibility with existing uses, while others do not). Our state law does not recognize any such presumption. Further, Cingular again incorrectly quotes the current and inapplicable version of chapter 20.33 TCC; the applicable version of the specific WCF design regulations does not specify a purpose to protect neighborhood character.

¶68 Cingular also disputes the hearing examiner's findings and conclusions via several incorrect assertions. For instance, Cingular asserts, "[i]ndeed, one of his SUP [Special Use Permit] conclusions cites no facts at all." Appellant's Br. at 22. But all of the hearing examiner's SUP conclusions reference one or more findings of fact. Only a single SEPA conclusion does not reference a finding of fact, and that is simply a summary of the relevant legal rules with internal references to pertinent statutes.

¶69 Cingular further asserts that the hearing examiner cites no facts in support of his conclusion that the WCF will

"detract from—not enhance—the rural agricultural character of the neighborhood." Appellant's Br. at 23. As the hearing examiner cites seven findings of fact in support, we disagree.

¶70 The hearing examiner cites facts establishing that the WCF would be 150 feet tall, with a three-sector antenna array (two antennas per sector); surrounding uses include rural residences and home-based businesses, with the nearest residence 300 feet away; the zone is rural residential, with WCFs permitted as a special use; 10 balloon photographs depict the likely visual impact of the WCF; the photographs fail to reveal the visual impacts on a neighborhood that would be impacted by the WCF;[10] the project site is used for community and recreational purposes, including a children's playground, picnic area, and volleyball court; area residents object on the basis of aesthetic and environmental impacts, including obstruction of Mt. Rainier views and vistas of open farmland; and neighborhood residents are committed to upholding the rural character of the neighborhood.

¶71 Cingular also argues that the hearing examiner contradicts himself by concluding that the WCF would detract from abundant wildlife even though he denied the SEPA appeal. But this mischaracterizes the hearing examiner's conclusion.

¶72 An issue in the SEPA appeal was whether the WCF would adversely impact area wildlife. The hearing examiner concluded that it would not. The issue in the SUP application was whether the WCF was appropriate for the proposed site in view of a number of criteria, including neighborhood character. The hearing examiner found: "The neighborhood is marked by scenic vistas of farmland and Mt. Rainier—a unique vista, home-based businesses, outdoor recreational opportunities, and abundant wildlife. A

---

[10] Cingular was required to submit balloon photographs with its application that show the WCF's visual impact on affected areas.

150-foot tall monopole tower would detract from these features." AR at 51. It is not inconsistent to conclude that, although the WCF will not harm wildlife, it will detract from area residents' enjoyment of wildlife, along with the other unique features of the area, such as vistas of open farmland and of Mt. Rainier.

¶73 Cingular cites *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 35, 891 P.2d 29 (1995), to support its argument that the Board erred in concluding that the removal of nine trees would have an adverse effect. In *Hilltop*, our Supreme Court affirmed the approval of a WCF on Whidbey Island, noting that its placement within a mature stand of trees, among other factors, provided substantial evidence in support of a finding that the WCF would have no significant visual impact. 126 Wn.2d at 25. The case is inapposite because it does not suggest that removal of trees could not properly be considered an adverse effect; nor does it suggest that placement within a stand of trees would always provide substantial evidence of no significant adverse visual impact.

¶74 Cingular further argues that the overwhelming evidence supports approval of the special use permit. Cingular asserts that the hearing examiner "ignored" objective evidence that the proposed WCF would not adversely affect the environment and instead relied solely on the "personal animosity" expressed by area residents. Appellant's Br. at 26.

¶75 In reviewing this argument, we defer to the fact finder's evaluation of the weight and credibility of the evidence. *J.L. Storedahl & Sons, Inc. v. Cowlitz County*, 125 Wn. App. 1, 11, 103 P.3d 802, 806 (2004), *review denied*, 155 Wn.2d 1002 (2005). As noted above, we review the hearing examiner's decision for substantial evidence. RCW 36-.70C.130(1)(c).

¶76 The record does not support Cingular's assertion that the hearing examiner "ignored" evidence in its favor.

The hearing examiner set forth a number of findings favorable to Cingular, indicating that he heard and considered all the evidence presented.

¶77 Nor does the record support Cingular's assertion that the "personal animosity" expressed by area residents swayed the hearing examiner. Appellant's Br. at 26. The hearing examiner expressly noted that he did not base his decision on residents' concerns about RF emissions, adverse impacts on the environment, or declining property values. Nevertheless, the hearing examiner determined that area residents credibly expressed valid concerns about the aesthetic impacts of the project. After considering all the evidence, the hearing examiner determined that the valid concerns about incompatibility with neighborhood character and adverse aesthetic impacts outweighed evidence in favor of the proposed use.

¶78 To bolster its argument that the hearing examiner's decision lacks substantial evidence supporting it, Cingular cites *Seattle SMSA Ltd., Partnership v. San Juan County*, 88 F. Supp. 2d 1128 (W.D. Wash. 1997). In *SMSA*, the county board denied a permit to construct two WCFs on Lopez Island. On appeal, the court reversed the decision, holding that the board's findings and conclusions made mere conclusory assertions without adequate reference to the administrative record. *SMSA*, 88 F. Supp. 2d at 1130. The county board had found that the WCF would " 'detract from the natural beauty and resources of the islands,' " but it did not cite any evidence in support. *SMSA*, 88 F. Supp. 2d at 1130 (quoting Finding of Fact 1). The county board also found the WCFs were inconsistent with the "rural-residential development patterns" at the proposed site. *SMSA*, 88 F. Supp. 2d at 1130.

¶79 The *SMSA* court found this to be an overly broad assertion that "could justify the denial of almost any application for any use." 88 F. Supp. 2d at 1130-31. Moreover, the board's findings indicated that it had improperly

considered the health impacts of RF emissions and unsubstantiated fears of declining property values, as well as the mere "vehement opposition" of area residents. *SMSA*, 88 F. Supp. 2d at 1131. The court remanded for additional findings in support of the board's decision.

¶80 The facts in *SMSA* clearly differ from those here where the hearing examiner entered 46 findings of fact. As noted above, the hearing examiner cites seven facts in support of finding that the WCF would detract from the neighborhood character. The hearing examiner expressly disregarded testimony and evidence on RF emissions and unsubstantiated fears of declining property values. And, as will be discussed more fully below, the hearing examiner did not rely on generalized community opposition but, rather, on specific concerns about incompatibility and aesthetic impacts, as he was allowed to do under the county zoning code.

¶81 The testimony of area residents amply demonstrates that the WCF would adversely impact views of Mt. Rainier and open vistas of rural farmland. Currently, no other structures pierce the natural skyline in that area, which remains undeveloped except for residences, some home businesses, and a handful of nonresidential structures, including a fire station, gas station, and church. We hold that the record contains sufficient evidence of incompatibility with neighborhood character and adverse aesthetic impacts to support the hearing examiner's decision.

## 2. Reliance on Neighborhood Opposition

¶82 Finally, Cingular contends that the hearing examiner improperly relied on general neighborhood discontent in denying the special use permit. Cingular cites a trio of cases for the proposition that local jurisdictions may not deny land use permits based solely on evidence of general neighborhood opposition: *Sunderland*, 127 Wn.2d 782; *Maranatha Mining, Inc. v. Pierce County*, 59 Wn. App. 795,

804, 801 P.2d 985 (1990); *Kenart & Assocs. v. Skagit County*, 37 Wn. App. 295, 680 P.2d 439, *review denied*, 101 Wn.2d 1021 (1984). These cases differ from the one before us.

¶83 In *Sunderland*, local officials denied a permit for a home for abused and neglected youth based on the unsubstantiated, generalized fears of area residents that the youth would frighten elderly residents, engage in criminal activity, bring other "nuisance activity," and reduce property values. 127 Wn.2d 782. In reversing, our Supreme Court found that the unsubstantiated fears of area residents could not provide substantial evidence in support of the land use decision. *Sunderland*, 127 Wn.2d at 787, 795. But unlike in *Sunderland*, here the hearing examiner expressly discounted unsubstantiated neighborhood fears about RF emissions, environmental impacts, and declining property values. Although "numerous letters leveled unfounded pecuniary and political charges against Cingular and the wireless services industry in general," the record does not support Cingular's assertion that the hearing examiner relied on such evidence. Appellant's Br. at 28. Rather, the hearing examiner relied on substantiated concerns about the WCF's incompatibility with the surrounding area and its adverse aesthetic impacts.

¶84 In *Maranatha Mining,* the county council denied a permit for gravel mining and asphalt production even though the applicant demonstrated a willingness and ability to mitigate each and every adverse impact opponents raised. 59 Wn. App. at 804. As in *Lakeside*, the hearing examiner had found that the proposed use complied with all zoning regulations and would pose no adverse impact, but the county council reversed without altering any of those findings. In reversing the council, we noted that we could not escape the conclusion that the council "based its decision on community displeasure and not on reasons backed by policies and standards as the law requires." *Maranatha Mining*, 59 Wn. App. at 805. We called the council's decision "a textbook example of arbitrary and capricious action:

without consideration and in disregard of the facts." *Maranatha Mining*, 59 Wn. App. at 804.

¶85 Unlike in *Maranatha Mining*, here the hearing examiner based the denial on factual findings that the proposed use would have substantial adverse aesthetic impacts and was incompatible with the neighborhood character, contrary to applicable zoning regulations. Although Cingular demonstrated a willingness and ability to mitigate most adverse impacts, the record supports the hearing examiner's finding that the project would nonetheless have a significant adverse visual impact, negatively affecting the unique neighborhood character.

¶86 In *Kenart*, a planning board denied a planned unit development permit based on a number of findings that either lacked factual support or did not provide a reason for denial. 37 Wn. App. 295. For example, the board found that the development would result in reduced agricultural lands, but the area was zoned residential. *Kenart*, 37 Wn. App. at 302. The board found that there would be increased traffic, but it did not address the applicant's mitigation proposal. *Kenart*, 37 Wn. App. at 302-03. In reversing, the court said, "[o]ur concern in this case is that the planning commission may have denied approval of the [planned unit development] as a result of community displeasure rather than for the reasons stated. In every instance the developer either satisfied, or offered a change to satisfy, the concerns raised; yet its application was denied based on findings which are virtually unreviewable." *Kenart*, 37 Wn. App. at 303. The findings the court deemed "unreviewable" were that the development would not serve the public interest and would interfere with rural life styles. *Kenart*, 37 Wn. App. at 302.

¶87 Unlike in *Kenart*, here no inconsistency exists between the reasons advanced for the denial and the county's zoning ordinances. And the decision is not "unreviewable" as was the *Kenart* board's bare conclusion that the devel-

opment would interfere with rural life styles. *Kenart*, 37 Wn. App. at 302-03.

¶88 In the instant case, the hearing examiner based his denial on a finding that the WCF would have an undue adverse effect on neighborhood character. That finding, in turn, was based on the project's adverse visual impact. Substantial evidence through testimony of area residents and photographs supports the finding of adverse visual impact. Unlike in *Kenart*, there is no reason to suspect that the real reasons for the hearing examiner's decision are anything other than those stated. The hearing examiner properly denied the permit based on specific adverse impacts, not generalized community opposition.

## D. ATTORNEY FEES

¶89 The county seeks attorney fees on appeal under RCW 4.84.370, which provides:

(1) . . . [R]easonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals . . . of a decision by a county . . . to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county . . . .

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

(2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

¶90 The Board affirmed the hearing examiner's denial of a special use permit, and the superior court affirmed the Board's decision. Because we affirm the superior court, the

county has prevailed at all three levels of review. Thus, we award reasonable attorney fees and costs under RCW 4-.84.370.

¶91 Affirmed.

ARMSTRONG and HUNT, JJ., concur.

Reconsideration granted and opinion amended May 23, 2006.