# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

LIND BROTHERS CONSTRUCTION, LLC, a Washington limited liability company,

Respondent,

v.

CITY OF BELLINGHAM, a Washington municipal corporation,

Appellant,

and

RESPONSIBLE DEVELOPMENT, a Washington nonprofit corporation,

Intervenor,

and PETER FRYE, an individual,

Appellant.

No. 67877-9-I
(consolidated with No. 67973-2-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 8, 2013

GROSSE, J. — The city of Bellingham's (City) denial of a lot line adjustment is proper when the proposed adjustment fails to meet the four criteria required for a lot line adjustment approval under Bellingham Municipal Code (BMC) 18.10.020(B). Here, the record supports the Hearing Examiner's determination that a builder's lot line adjustment proposal did not meet three of these requirements because it did not meet minimum density requirements, further infringed on the City's Land Use Development Ordinance's setback requirements, and did not improve the function and utility of the existing lots. Thus, the Hearing Examiner's decision to affirm the City's denial of the lot line adjustment was proper and the superior court's reversal of the Hearing Examiner's ruling was error. Accordingly, we reverse the superior court.

## FACTS

Lind Brothers Construction, LLC (Lind) sought to develop property it owns in Bellingham. The property consists of two lots located between two streets, Star Court to the north and Harrison Street to the south. The boundary between the lots runs north to south with both lots abutting Star Court and Harrison Street. Both streets are unimproved rights-of-way.

The lots are in an area zoned as single family residential with a 20,000-foot minimum lot size. One lot was approximately 8368 square feet and the other was 5578 square feet. Because the lots did not meet the 20,000-foot minimum zoning requirement, Lind applied for lot line adjustments permit to obtain approval for the development of two single-family residences on the property. The permit application proposed to alter the boundary to an east/west orientation, with one lot (proposed Lot A) abutting only Harrison Street to the south and the other lot (proposed Lot B) abutting Star Court to the north with a 20-foot wide pipestem along the easterly side of Lot A that extends to Harrison Street.

The lots and abutting rights-of-way contained regulated wetlands. Because the development proposed by Lind included impacts to the wetlands and required buffer areas, Lind also applied for wetland/stream permit. Lind's proposal located septic drainfields within the wetland and buffer areas and in the access portion of one lot within the wetland. The permit application proposed onsite and offsite mitigation for these impacts.

Lind filed the lot line adjustment and wetland/stream permit applications with the City on December 5, 2005, in compliance with the City's Wetland Stream Ordinance,

2

former chapter 16.50 BMC. The next day, December 6, 2005, the City's Critical Areas Ordinance, chapter 16.55 BMC, took effect and replaced the Wetland Stream Ordinance. The City processed Lind's wetland/stream permit application under the former ordinance.

The City determined that Lind's applications lacked adequate information to evaluate the proposal for its consistency with the City's development standards and its potential environmental impacts. The City noted that Lind's applications did not include any requests for variances from the City's development or subdivision standards. As a result, the City made repeated requests of Lind for more information.

On January 10, 2006, the City notified Lind that its applications did not contain enough information to prepare a Notice of Application or a State Environmental Policy Act (SEPA) determination and requested that it "[p]rovide a detailed SEPA checklist for the entire project, including road construction, lot development, utilities, and stormwater management (if required by the Public Works Dept.)" On February 16, 2006, the City notified Lind that it would review the wetland/stream permit application concurrently with the lot line adjustment application and that further review of the lot line adjustment application would continue after staff completed a preliminary environmental review.

On October 10, 2006, City Planners Kim Weil and Kathy Bell met with Lind's owner, John Lind, and its wetland consultant, biologist Vikki Jackson. They discussed zoning and wetland setbacks, and siting of the septic system. The City staff recommended that Jackson and a qualified engineer work on a potential variance package.

On March 29, 2007, the City made a second request for the SEPA checklist and

3

also requested verification of the Harrison Street right-of-way width and center line, a copy of the Whatcom County Health Department septic permit allowing two septic systems or a plan to connect to the City sewer service, an engineering analysis showing construction feasibility of the road, a preliminary stormwater plan, a fire truck turnaround plan, and plans for fully abutting public water and sewer, and a minimum standard street.

On December 5, 2008, Lind's engineer provided the City with a complete SEPA checklist and detailed information about Lind's development proposal. Lind also provided a new wetland mitigation plan. On February 27, 2009, the City requested that Lind provide a SEPA mailing list and fees for the SEPA checklist. On May 8, 2009, Lind supplied a SEPA mailing list to the City and paid its SEPA fee. On May 22, 2009, a Notice of Application for the wetland/stream permit was sent to those on the mailing list and the City received back comments on the application.

On June 12, 2009, City Planner Weil sent Lind a letter stating that the City had completed the project and environmental analysis of the lot line adjustment and wetland/stream permit applications and prepared a list of conditions for a SEPA Mitigated Determination of Non-Significance (MDNS) as required by WAC 197-11-350. The letter further requested that Lind meet with Weil and Bell to discuss the conditions, which required better protection of the wetlands, verification that development setbacks will be met, and other conditions that address impacts they believed had not been mitigated adequately. Lind did not respond to this request to meet.

On June 27, 2009, the City issued the MDNS for Lind's proposal, which was subject to a 14-day public comment period. During this time, the City accepted

comments from the public raising the issue of whether the wetland on the property was a mature forested wetland that would be classified as a Category I wetland requiring a 100-foot buffer. On August 7, 2009, Weil e-mailed John Lind about the citizens' concerns and advised that he could have a field analysis done to determine if the area met the criteria for a mature forested wetland or the City could revise the MDNS to add a condition for a tree assessment to be done. Lind did not respond. On August 28, 2009, the City issued a revised MDNS that addressed the categorization of the wetland as a mature forested wetland. On January 13, 2010, the City denied Lind's applications for lot line adjustment and wetland/stream permit.

Lind appealed both the initial MDNS and the revised MDNS and the City's denials of the lot adjustment and wetland/stream permits to the City Hearing Examiner. The Hearing Examiner affirmed the City's decisions denying the permits. Lind then filed an appeal in Whatcom Superior Court under the Land Use Protection Act (LUPA), seeking reversal of the Hearing Examiner's decision. On October 10, 2011, the trial court reversed the Hearing Examiner's decision and ordered that the City grant the lot line adjustment. The trial court further ordered that the wetland/stream permit and revised MDNS be remanded, and the City staff issue a wetland/stream permit consistent with the court's decision. The court also remanded to the Hearing Examiner to issue a decision regarding Lind's appeal of the conditions in the revised MDNS. The City appeals from that reversal. Also joining the appeal is Peter Frye, a neighbor of the property at issue.[1]

---

[1] Frye essentially repeats the same arguments raised in the City's appeal.

ANALYSIS

In reviewing the superior court's decision on a LUPA appeal, this court stands in the shoes of the superior court and reviews the Hearing Examiner's decision on the record before the Hearing Examiner. The party who filed the LUPA appeal bears the burden of proof and must establish:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.[2]

Standards (a), (b), (e) and (f) present questions of law that are reviewed de novo, but under (b) the reviewing court also gives deference to the Hearing Examiner's construction of local land use regulations based on her specialized knowledge and expertise.[3] Standard (c) involves factual determinations that are reviewed for

---

[2] RCW 36.70C.130(1).
[3] Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 768, 129 P.3d 300 (2006); City of Federal Way v. Town & Country Real Estate, LLC, 161 Wn. App. 17, 37, 252 P.3d 382 (2011).

supporting substantial evidence.[4] The reviewing court considers all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority.[5]

The Bellingham Municipal Code (BMC) contains provisions governing the approval of lot line adjustments. BMC 18.08.265 defines a lot line adjustment as:

> [A] revision made for the purpose of adjusting boundary lines which does not create any additional lot, tract, parcel, site or division nor create any lot, tract, parcel, site or division which contains insufficient area and dimension to meet minimum requirements for width and area for a building site.

BMC 18.10.020(B) provides that in order for the City to approve a lot line adjustment, the following must be established:

1. No new lots are created;
2. Each parcel as proposed meets minimum lot standards as specified in Chapter 18.36, or that each parcel if already less than the required minimum is not further reduced as a result of the proposed lot line adjustment;
3. The lot line adjustment does not further infringe on any applicable section of the Land Use Development Ordinance; and
4. The lot line adjustment improves the overall function and utility of the existing lots.

The City denied the lot line adjustment permit based on the failure to comply with three out of these four criteria (2, 3, and 4). The decision was issued by the Director of the City's Department of Planning and further concluded that the wetland/stream permit was denied because it relied on a specific layout that does not meet the minimum requirements of chapter 18.10 BMC.

The Hearing Examiner affirmed this decision, concluding that the lot line adjustment proposal failed to meet three of the four criteria specified in BMC

---

[4] Cingular Wireless, 131 Wn. App. at 768.
[5] Cingular Wireless, 131 Wn. App. at 768.

18.10.020(B), noting that all four requirements must be met for approval of a lot line adjustment. She concluded that it did not meet the requirement of BMC 18.10.020(B)(2) because the proposed lots were less than the minimum site area of 20,000 square feet required by the zoning designation for that area and the line adjustment proposal further reduces the site area of each of the lots than currently exists, noting that the pipestem portion of one of the lots must be excluded in determining the area under BMC 18.08.245. The Hearing Examiner further concluded that she lacked authority to consider additional options submitted by Lind because they were not included in any of the applications before its denial and all proposals must be first be submitted for administrative approval by the Department Director.

The Hearing Examiner also concluded that Lind's lot line adjustment proposal did not meet the requirement of BMC 18.10.020(B)(3) that it not infringe on the Land Use Development Ordinance because it "seeks to modify an existing lot that has sufficient dimensions to comply with the front yard setback requirements of the Land Use Development Ordinance, BMC 20.30.040(F), creating a lot that cannot comply with these requirements." The Hearing Examiner further concluded that the proposal did not meet the requirement of BMC 18.10.020(B)(4) that it improve the overall function and utility of the existing lots because dedication of additional right-of-way to provide a standard 60-foot right-of-way reduces the functional size of proposed Lot A by up to 30 feet in depth and that this, combined with the application of setback requirements to Lot A, leaves it without function and utility. The Hearing Examiner also concluded that function and utility was diminished because the proposal creates one unbuildable lot and another that will require substantial impacts to a wetland and buffer area for

development.

The trial court reversed, issuing only the following ruling without entering any findings and conclusions:

> ORDERED that the Hearing Examiner's decision denying the lot line adjustment is reversed, and the City shall therefore grant the lot line adjustment.
>
> ORDERED that the wetland/stream permit and revised MDNS is remanded, and the City staff shall issue a wetland/stream permit consistent with the court's decision and the Hearing Examiner shall issue a decision regarding Petitioner's appeal of the conditions in the revised MDNS.

## A. Minimum Density Requirement

The City first contends that the superior court erred by reversing the Hearing Examiner's ruling because Lind's proposal failed to meet the minimum density requirement of BMC 18.10.020(B)(2). The City argues that the Hearing Examiner correctly excluded the pipestem area from the area calculation, resulting in a lot size that did not meet the minimum density requirement. Lind argues that the pipestem area is not excluded from the lot area for purposes of satisfying the minimum density requirement of BMC 18.10.020. We disagree.

The City relies on the definition of "lot area" provided in BMC 18.08.245:

> **"Lot area"** means the total horizontal area within the boundary of the lot lines of a parcel and expressed in terms of square feet or acres. For purposes of determining the area in a "pipestem lot," the area shall be defined as the square footage of the lot exclusive of the pipestem portion of the lot.

Lind argues that the term "lot area" is specified in other sections of BMC Title 18, but it is not referenced in the applicable ordinance, BMC 18.10.020(B)(2), which only references "parcel," stating that "each parcel" may not be further reduced as a result of

9

the lot line adjustment. Thus, Lind contends this provision must be interpreted to mean only that the adjusted lots cannot be reduced from the original size without regard to whether there is a pipestem.

But as the City counters, using the definition of "lot area" to determine whether a parcel's area is further reduced as a result of a proposed lot line adjustment is consistent with the lot line adjustment provisions. "Lot line adjustment" is defined as

> a revision made for the purpose of adjusting boundary lines which does not create any additional lot, tract, parcel, site or division nor create any lot, tract, parcel, site or division which contains insufficient area and dimension to meet minimum requirements for width and area for a building site.[6]

"Lot" is defined as

> a fractional part of subdivided lands having fixed boundaries being of sufficient area and dimension to meet minimum zoning requirements for width and area. "Lot" includes tracts or parcels of land.[7]

Accordingly, for purposes of meeting the minimum density requirement of BMC 18.10.020(B)(2) , the area calculation excludes the pipestem area.

Lind further contends that BMC 18.36.020 exempts smaller non-conforming lots from any site area requirements. Lind cites BMC 18.36.020(A), which provides:

> All lots shall be of sufficient size to meet the site area requirements specified within the area's land use designation under "density" found within the applicable Neighborhood Plan in which the property is located; provided, however, that this minimum shall not be required in the following instances:
>
> . . . .
> 3. Lot line adjustments pursuant to Section 18.10.010 for lots presently having less site area than the required minimum lot size.

The City agrees that existing lots that are smaller than the minimum site area

---

[6] BMC 18.08.265.
[7] BMC 18.08.240

10

requirements are not subject to the area requirements of BMC 18.36.020, but correctly notes that such lots are addressed by BMC 18.10.020(B)(2), which requires that such lots are not further reduced in size by a lot line adjustment proposal. Here, excluding the proposed pipestem area, the lots are further reduced in size.

Thus, Lind has failed to show that the lot line adjustment proposal meets the minimum density requirement of BMC 18.10.020(B)(2). Because the ordinance provides that all four requirements must be met for approval of a lot line adjustment, the Hearing Examiner properly affirmed the City's decision to deny the lot line adjustment permit based on failure to comply with this requirement alone. Accordingly, the superior court erred by reversing the Hearing Examiner's decision. Although we need only determine that one requirement of BMC 18.10.020(B) was not met to warrant denial of a permit, we also conclude that the other requirements were met.

B. Further Infringement of Land Use Development Ordinance

The Hearing Examiner concluded that Lind's proposal fails to satisfy the criteria of BMC 18.10.020(B)(3) because it creates a lot that cannot comply with the Land Use Development Ordinance's setback requirements. As stated in Conclusion of Law 6:

> The proposed lot line adjustment would result in further infringement of the provisions of the Land Use Development Ordinance. As currently configured the existing lots have a depth of approximately 110 feet. As proposed Lot A has a depth of approximately 50 feet. Because Harrison Street has a right-of-way width of approximately 33 feet, less than the required standard of 60 feet, BMC 20.10.080E provides that the centerline for setback purposes is the farthest edge of the existing right-of-way that was dedicated by the subject property. Harrison Street was dedicated entirely by the Happy Valley plat. None of the right-of-way was dedicated from the subject property so the centerline for setback purposes is the southern property line of the lots. BMC 20.30.040F requires a minimum front yard setback of 50 feet from the centerline of the abutting street. Application of the front yard setback requirement leaves no buildable area on proposed Lot A. Application of the front and side yard (five feet on

11

each side) setback requirements to the existing smaller lot leaves a buildable area of approximately 40 feet by 40 feet. The proposal seeks to modify an existing lot that has sufficient dimensions to comply with the front yard setback requirements of the Land Use Development Ordinance, BMC 20.30.040F, creating a lot that cannot comply with these requirements.

While Lind contends Harrison Street was not intended to be the principal means of access to the abutting property and therefore was not a through lot or a street requiring setbacks, the Hearing Examiner's findings of fact that stated otherwise are unchallenged and therefore verities on appeal. Finding of Fact 9 states: "The applications for lot line adjustment and a wetland/stream permit were submitted to obtain approval for the development of two single-family residences on the properties with street access from Harrison Street." Finding of Fact 54 states:

> The Harrison Street right-of-way is approximately 33.6 feet in width. It is unimproved abutting the Lind Bros. property. A gravel driveway and private structure encroachments are located within the right-of-way to the east of the property. Harrison Street is a non-arterial, residential access street. BMC 18.08.420 defines a "street" as a right-of-way having a width of 30 feet or more which provides the principal means of access to the property.

These findings are also supported by the record. The Lind proposal shows Lot A abutting Harrison Street to the south. Additionally, testimony from Bruce Ayers, who helped Lind prepare the application, concedes that Harrison Street was considered the access road to avoid wetland impacts:

> [G]iven the impacts of improving Star Court, because that would go right through the middle of the wetland and the buffers and cause greater impact to develop Star Court road for access we then looked to the option of accessing from Harrison Street because the wetland didn't encumber Harrison Street as much as it does Star Court. So the decision to access off Harrison Street was a legitimate and good faith effort to minimize our impacts and not build a road on Star Court because we didn't want those greater impacts.

12

Accordingly, the Hearing Examiner did not err by concluding that Lind's proposal further infringes on the Land Use Development Ordinance by failing to comply with its setback requirements. While Lind argues that the alternative would equally infringe on City ordinances by having a greater impact on wetlands and buffers, the City correctly notes that the requirement of BMC 18.10.020(B)(3) that the proposal not "further infringe" applies to the City Land Use Ordinance, codified in Title 20 BMC, not the City's wetland regulations which are codified in former chapter 16.50 BMC, the Wetland Stream Ordinance.

## C. Improvement of Function and Utility of Existing Lots

The Hearing Examiner concluded that Lind's proposal does not improve the function and utility of the existing lots because dedication of an additional right-of-way to provide a standard 60-foot right-of-way width, combined with the setback requirements, reduces the functional size of the property. The Hearing Examiner further concluded:

> The proposal locates septic drainfields within the wetland buffer area. It locates the access portion of Lot B within the wetland. Although the existing configuration of the larger lot may not be ideal with respect to avoidance of wetland and buffer impacts, the determination of the Director that the proposal does not improve the overall function and utility of the existing lots due to the wetland and buffer impacts is not erroneous. The proposal does not improve the function and utility of the existing smaller lot which is currently located almost entirely outside the wetland and buffer areas that are shown on the site plan. Because of the deficiencies previously noted with respect to proposed Lot A the proposal creates one unbuildable lot and another that will require substantial impacts to a wetland and buffer area for development. This does not appear to be an improvement to the function and utility of the existing lots.

This conclusion is supported by the record. The exhibit showing the site plan layout of the existing lots locates the smaller lot almost entirely outside of the wetland and buffer areas, while the layout for the proposed lots shows that access and onsite

13

septic systems are located almost entirely within the wetland buffer. But Lind points out that as the lots currently exist, only one house could be constructed without impacting the wetland, whereas the proposed lot adjustment would result in having two buildable lots outside of the wetland. Thus, at most, the record shows that both configurations have equal impact on the function and utility on the land, but it cannot be said with certainty that one is in fact an improvement over the other. Lind has therefore failed to show that the Hearing Examiner erred by concluding that the proposal did not improve the function and utility of the existing lots.

Because Lind's proposal fails to meet the four criteria required for a lot line adjustment approval, Lind has failed to show that the Hearing Examiner's denial of the lot line adjustment was error. Accordingly, the superior court's reversal of this decision was in error and we reverse the superior court and affirm the Hearing Examiner's ruling. Because Lind cannot proceed without approval of the lot line adjustment, a determination on the issuance of the wetland/stream permit is unnecessary. Accordingly, we reverse the superior court's order requiring that the City issue a wetland/stream permit and that the Hearing Examiner issue a decision on Lind's appeal of the conditions in the revised MDNS.

WE CONCUR:

14