**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

|  |  |
|---|---|
| FALL CITY SUSTAINABLE GROWTH, <br><br> Appellant, <br><br> v. <br><br> KING COUNTY; MT. SI INVESTMENTS, LLC; CEDAR 17 INVESTMENTS, LLC; CHA CHA 15 INVESTMENTS, LLC; TAYLOR DEVELOPMENT, INC., <br><br> Respondents. | No. 86032-1-I <br><br> DIVISION ONE <br><br> PUBLISHED OPINION |

MANN, J. — In this land use case, Fall City Sustainable Growth (FCSG) appeals the approval of three preliminary subdivision or plat applications[1] in the Rural Town of Fall City. FCSG argues that King County's hearing examiner was required to deny the plat applications after the hearing examiner determined that the applications were not consistent with the King County Comprehensive plan (K.C. Comp. Plan) by protecting rural character. FCSG contends that denial was mandatory, despite the hearing examiner finding that the plat applications were consistent with the applicable

_____

[1] For the purpose of this opinion, subdivision and plat are used interchangeably.

development regulations, adequately provided for a range of services required by state law and county code, and served the public health, safety, and general welfare.

While the hearing examiner was within their authority to determine the plat applications did not protect what they interpreted as the rural character, the hearing examiner did not err in approving the plat applications. The hearing examiner correctly followed Washington's land use statutes and longstanding jurisprudence in concluding that the plat applications should be approved. We affirm.

I

Taylor Development (Taylor), through three separated corporate identities, submitted three applications for residential subdivisions or plats within the Rural Town of Fall City. The Cedar 23 plat application vested[2] March 19, 2021, and proposes subdividing 5.74 acres into 23 lots for single-family homes with an average lot size of 5,034 square feet. The Mt. Si plat application vested March 23, 2021, and proposes subdividing 4 acres into 16 lots for single-family homes with an average lot size of 4,751 square feet. And the Cha Cha plat application vested July 8, 2021, and proposes subdividing 3.63 acres into 15 lots for single-family homes with an average lot size of 5,839 square feet. The Fall City Rural Town is zoned R-4 which allows a maximum of four residential homes per acre. All three plat applications propose development within the maximum allowed density.

The King County Department of Local Services (DLS) first reviewed the applications. DLS received public comments on the applications which included

---

[2] KCC 20.20.070(A) provides that applications for Type 3 approvals, including subdivisions, vest on the date a complete application is submitted.

concerns about pedestrian safety and increased traffic, impact on area schools, lot sizes, loss of wildlife habitat, proposed large onsite septic, and the allowed density and inconsistency with existing rural character of Fall City. DLS issued a staff report for each application and recommended approval of each plat, subject to detailed conditions. DLS then transmitted its recommendations to the hearing examiner.

Under King County Code (Code), preliminary plat decisions are made by the hearing examiner following an open record hearing. KING COUNTY CODE (KCC) 20.20.020. The public hearing before the hearing examiner for Cedar 23 was held on February 28, 2023. After taking testimony, reviewing the application, and applicable statutory and code requirements, the hearing examiner issued their report and decision approving the plat application with conditions. In lengthy findings, the hearing examiner addressed topics including rural character, the environment, cultural resources, critical areas, stormwater/drainage, transportation, parking, fire protection, water supply, sewage disposal, recreations, schools and safe walking routes.

In the discussion of rural character, the hearing examiner discussed and distinguished a prior plat application approval in Fall City:

> 13. In the 2017 decision on the Fall City preliminary plat (now known as and referred to herein as Arrington Court), this Examiner concluded that the R-4 zoning as conditioned by KCC 21A.12.030.B.22 and B.23 is consistent with the 1999 Fall City Plan and the King County Comprehensive Plan and protects rural character.

> 14. The record developed in this matter does not allow the Examiner to reach the same conclusion as a matter of law.

The hearing examiner described several components they considered in reaching this determination, including the increased densities allowed by using large on-site septic systems (LOSS), and parking:

> B. The use of LOSS systems as opposed to individual on-site septic systems (OSS) allows an applicant to increase significantly the number of lots that can be created and to reduce significantly the lot sizes. In Cedar 23, 18 lots could be developed using OSS (assuming a 4-bedroom home on each lot) as compared to the 23 that can be developed using LOSS (assuming a 3-bedroom home on each lot).
>             . . . .
>
> E. . . . Cedar 23, . . . will provide adequate parking for their residents, but little or no room for boats, trailers, RVs, and other recreational vehicles typical in rural areas.

The hearing examiner continued, however, and explained that, despite not being consistent with their interpretation of rural character, the application was consistent with the allowed density and density was the only tool provided to address rural character:

> 15. For these reasons, the Examiner is not persuaded that Cedar 23 is consistent with rural character. Exhibit P13 and testimony from numerous witnesses offered tools that would increase its compatibility, such as somewhat larger lots, somewhat smaller homes, variety in the design of homes, and varying setbacks. However, the King County Council has not given Permitting or the Examiner tools other than the maximum density to address compatibility with rural character.
>
> 16. As concluded below, the Project is consistent with the maximum density of four dwelling unit/acre for the Rural Town of Fall City.

Relying on Citizens for Mount Vernon v. City of Mount Vernon, 133 Wn.2d 861, 873, 947 2nd 1208 (1997), and RCW 36.70B.030(1) and .040(1), the hearing examiner concluded that project decisions are determined by applicable development regulations:

> [D]uring Project review, applicable development regulations are determinative of the type of land use permitted at the site. RCW 36.70B.030(2)(a). It is true that, in the absence of applicable development regulations, the local government may consider the appropriate elements

of the comprehensive plan adopted under the GMA to determine the type of land use, level of development and characteristics of the development, among other things. RCW 36.70B.030(1), 36.70B.040(1). However, this is not the case here. The King County Council had adopted specific density requirements for the Fall City Rural Town and has chosen not to adopt other regulations many of those submitting written or oral comments wish they had. Finally, even assuming there [was] an inconsistency between the zoning and the King County Comprehensive Plan, a specific zoning ordinance prevails over an inconsistent comprehensive plan.

The hearing examiner then concluded that the plat application would serve the public health, safety, and welfare, and the public use and interest:

9.      The proposed preliminary plat, as conditioned below, would conform to applicable land use controls. In particular, the proposed type of development, and overall density are specifically permitted under the R-4 zoning regulations for the Rural Town of Fall City.

10.      If approved subject to the conditions below, the proposed preliminary plat will make appropriate provisions for the topical items enumerated within RCW 58.17.110, and will serve the public health, safety and welfare, and the public use and interest.

11.      The conditions for final plat approval set forth below are reasonable requirements and in the public interest.

The public hearings for Mt Si and Cha Cha were held on March 29, 2023, and May 4, 2023, respectively. The hearing examiner's findings and conclusions, including the discussion of rural character, the application of state law, and conclusions addressing the public health, safety and welfare, and public interest for the Mt Si and Cha Cha applications were virtually identical to the Cedar 23 findings and conclusions above. The hearing examiner concluded that the Mt Si and Cha Cha plat applications were consistent with R-4 zoning and thus approved them with conditions.

FCSG appealed the three proposed preliminary plats to the King County Council.[3]  The Council sustained the decisions of the hearing examiner and adopted the preliminary plats.[4]

FCSG appealed the Council's decision to King County Superior Court under the Land Use Petition Act (LUPA), ch. 36.70C RCW.  The parties stipulated to transfer the petitions to this court for review.

II

We begin with a brief overview of planning under the GMA, and King County's planning efforts leading to the K.C. Comp. Plan, Fall City Subarea Plan, and King County's development regulations.

A

Prior to 1990, "[l]and use planning in Washington [was] historically . . . a function left to local governments with the state playing a limited role." Ass'n of Rural Residents v. Kitsap County, 141 Wn.2d 185, 188, 4 P.3d 115 (2000).  Planning was done largely under the framework of the Planning Enabling Act, ch. 36.70 RCW.  But "[w]ith passage of the GMA, the system changed to a comprehensive planning framework under which local governments are required to plan according to general mandates established by the Legislature." Ass'n of Rural Residents, 141 Wn.2d at 188.[5]

---

[3] FCSG also appealed a fourth preliminary plat known as Fall City II, but that appeal is not before the panel.  The Code in effect at the time allowed appeal of preliminary plat decisions to the Council. KCC 20.20.020, Ord. 19291.

[4] King County Ord. 19673, 19674, and 19675.

[5] While most counties, and the cities within those counties, are subject to all of the GMA requirements, ten smaller counties have more limited GMA obligations.  See Save Our Scenic Areas v. Skamania County, 183 Wn.2d 455, 459, 352 P.3d 177 (2015).

The GMA was enacted in 1990 and 1991 "in response to public concerns about rapid population growth and increasing development pressures in the state, especially in the Puget Sound region." King County. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 546, 14 P.3d 133 (2000). "Through the GMA, the legislature sought to minimize 'uncoordinated and unplanned growth,' which it found to 'pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state.'" Whatcom County v. Hirst, 186 Wn.2d 648, 671-72, 381 P.3d 1 (2016).

The GMA contains 15 nonprioritized goals which create a "'framework' that guides local jurisdictions in the development of comprehensive plans and development regulations." Viking Props., Inc. v. Holm, 155 Wn.2d 112, 125, 118 P.3d 322 (2005), abrogated by Yim v. City of Seattle, 194 Wn.2d 682, 451 P.3d 694 (2019); RCW 36.70A.020, .3201. The GMA's goals include: encouraging development within urban areas, reducing sprawl, planning for and accommodating "housing affordable to all," promoting a variety of residential densities, retaining open space, protecting the environment, and protecting private property rights. RCW 36.70A.020. "Within this framework, the legislature has affirmed that there is a 'broad range of discretion that may be exercised by counties and cities consistent with the requirements . . . and goals of [the GMA].'" Viking Props., 155 Wn.2d at 125 (quoting RCW 36.70A.3201).

The GMA recognizes the importance of rural lands and rural character and requires local governments to include a rural element in comprehensive plans. RCW 36.70A.011, .070. The rural element must provide for a variety of uses and densities and must include several measures to address rural development such as assuring

visual compatibility to surrounding areas and reducing inappropriate conversion of undeveloped land:

> Rural development. The rural element shall permit rural development, forestry, and agriculture in rural areas. The rural element shall provide for a variety of rural densities, uses, essential public facilities, and rural governmental services needed to serve the permitted densities and uses. To achieve a variety of rural densities and uses, counties may provide for clustering, density transfer, design guidelines, conservation easements, and other innovative techniques that will accommodate appropriate rural economic advancement, densities, and uses that are not characterized by urban growth and that are consistent with rural character.

RCW 36.70A.070(5)(b). More intensive rural development, including the infill, development, or redevelopment of existing commercial, industrial, and residential areas may be allowed in the rural element subject to limitations. RCW 36.70A.070(5)(d). "GMA does not dictate a specific manner of achieving a variety of rural densities. Local conditions may be considered and innovative zoning techniques employed to achieve a variety of rural densities." Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd., 164 Wn.2d 329, 359-60, 190 P.3d 38 (2008).

To implement the GMA, local governments must first develop planning policies. Larger counties, including Snohomish, King, and Pierce Counties, with contiguous urban areas must adopt multicounty planning policies (MPPs) to establish a region-wide framework that ensures consistency among comprehensive plans and county-wide planning policies. RCW 36.70A.210(7); WAC 365-196-305(8). The GMA next required counties, in cooperation with cities within the counties, to adopt countywide planning polices (CPPs). RCW 36.70A.210(2). As the Supreme Court explained:

> A CPP is a written policy statement created by county municipalities and used "solely for establishing a county-wide framework from which county and city comprehensive plans are developed." RCW 36.70A.210(1).

CPPs ensure that city and county comprehensive plans are consistent with one another with regard to issues of regional significance, and thus CPPs must address policies for designation of UGAs, as well as policies for providing urban services, transportation, housing, and economic development. RCW 36.70A.210(3).

King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 138 Wn.2d 161, 167, 979 P.2d 374 (1999).

The GMA next required most counties to adopt, and to periodically update, a comprehensive plan. RCW 36.70A.130. Comprehensive plans include polices covering a broad range of topics. Comprehensive plans must include a map that assigns a land use designation to all areas of the county. RCW 36.70A.070; WAC 365-196-400, -405. The comprehensive plan policies, among other purposes, guide decisions about the land use designation of particular areas. WAC 365-196-405(2)(i)(ii). For maps, the first GMA obligation was to designate natural resource lands (mineral, forest, and agriculture). RCW 36.70A.170. The next obligation was to designate lands as the urban growth area. RCW 36.70A.110. The remaining land in each county constituted rural areas.

Finally, the GMA required counties and cities to adopt development regulations to implement their comprehensive plans. RCW 36.70A.040(3)-.040(5) (requirements regarding development regulations; RCW 36.70A.130(1)(e) (amendments). Development regulations include zoning maps and detailed regulations. The zoning assigned to each particular area must be consistent with the more general land use designations established in the comprehensive plan. RCW 36.70A.040(3)(d). Development regulations are presumed valid upon adoption. RCW 36.70A.320(1).

Once adopted, development regulations largely control cite specific land use decisions. As our Supreme Court has summarized:

> Comprehensive plans serve as "guide[s]" or "blueprint[s] to be used in making land use decisions. Thus, a proposed land use decision must only generally conform, rather than strictly conform, to the comprehensive plan. A comprehensive plan does not directly regulate site-specific land use decisions. Instead, local development regulations, including zoning regulations, directly constrain individual land use decisions.

Woods v. Kittitas County, 162 Wn.2d 597, 612-14, 174 P.3d 25 (2007) (citing Citizens for Mount Vernon, 133 Wn.2d at 873; Viking Props., 155 Wn.2d at 126).

The legislature agrees. In 1995, the legislature adopted the "Local Project Review Act," ch. 36.70B RCW, with the intent "to establish a mechanism for implementing the provisions of [GMA] regarding compliance, conformity, and consistency of proposed projects with adopted comprehensive plans and development regulations." LAWS OF 1995, ch. 347, §§ 404, 405. The legislature explained that where there are adopted development regulations, project consistency with the GMA is determined by the development regulations where they exist, and in their absence, the comprehensive plan. Under RCW 36.70B.030(1):

> (1) Fundamental land use planning choices made in adopted comprehensive plans and development regulations shall serve as the foundation for project review. The review of a proposed project's consistency with applicable development regulations, or in the absence of applicable regulations the adopted comprehensive plan, under RCW 36.70B.040 shall incorporate the determinations under this section.

And under RCW 36.70B.040:

> (1) A proposed project's consistency with a local government's development regulations adopted under chapter 36.70A RCW, or, in the absence of applicable development regulations, the appropriate elements of the comprehensive plan adopted under chapter 36.70A RCW shall be decided by the local government during project review by consideration of:

(a) The type of land use;
(b) The level of development, such as units per acre or other measures of density;
(c) Infrastructure, including public facilities and services needed to serve the development; and
(d) The characteristics of the development, such as development standards.

B

Consistent with the GMA hierarchy, the Puget Sound Regional Council (PSRC) was designated as the agency responsible for meeting the GMA's MPP requirements. The member entities, including Snohomish, King, and Pierce Counties, adopted their MPPs, known as Vision 2050, in 1992. The Vision 2050 MPPs are broad and cover regional growth management and other issues requiring regional coordination including transportation, open space, air and water quality, economic development, and regional facilities.[6] Rural protection is one function of the MPPs which recognize the variety of uses and residential patterns that preserve rural character.[7]

King County's CPPs were also first adopted in 1992. King County Ordinance 10450 (2012); City of Snoqualmie v. King County, No. 92-3-0004, 1993 WL 839711 (Wash. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.), https://eluho2022.my.site.com/casemanager/s/eluho-document/a0T82000000KS1PEAW/19930301-city-of-snoqualmie-v-king-county-final-decision-and-order. The CPPs address a broad range of subjects, including rural areas, and implement the MPPs in Vision 2050.[8]

---

[6] Puget Sound Reg'l Council, VISION 2050: A Plan for the Central Puget Sound Region, at i (Oct. 2020) (Resolution PSRC-A-2020-02) (hereinafter Vision 2050), https://www.psrc.org/sites/default/files/2022-11/vision-2050-plan.pdf

[7] Vision 2050 at 24.

[8] 2021 King County Countywide Planning Polices at 6 (ratified Nov. 30, 2023) (https://kingcounty.gov/en/dept/executive/governance-leadership/performance-strategy-budget/regional-planning/cpps).

The K.C. Comp. Plan was first adopted in 1994 and has been updated several times. The version applicable in this case is the 2016 update. The K.C. Comp. Plan covers the full spectrum of planning goals and requirements covered by the GMA, MPPs, and CPPs. The comprehensive plan establishes the geographic boundaries of the Rural Area and includes policies describing the range of uses allowed there.

The K.C. Comp. Plan establishes the land use designation of Rural Town. The Rural Town designation recognizes existing development patterns and allows commercial uses to serve rural residents. The K.C. Comp. Plan also recognizes that higher density development may occur in Rural Towns than in other Rural Areas:

> [A]lthough Rural Towns also may in some circumstances develop at densities similar to those in the Urban Growth Area or in Cities in the Rural Area, they are considered part of the Rural Area for the purposes of the [GMA], do not provide significant growth capacity, and are not subject to the growth targets adopted for the Urban Growth Area.

K.C. Comp. Plan, at 3-33. The K.C. Comp. Plan designates three Rural Towns: Fall City, Snoqualmie Pass, and Vashon.

The K.C. Comp. Plan differentiates between Rural Towns and areas outside of Rural Towns. Policy R-302 provides for more flexible development standards inside of Rural Towns. Outside of Rural Towns, rural development is restricted to "low densities compatible with traditional rural character and uses, farming, forestry, mining, and rural service levels." Under Policy R-506, "Rural Towns may contain higher density housing than permitted in the surrounding Rural Area, and should provide affordable and resource-worker housing if utilities and other services permit. Development Density in Rural Towns may approach that achieved in Cities in the Rural Area." And Policy R-507 notes that Rural Towns serve as activity centers and, provided sufficient utilities are

-12-

available, may include "[r]esidential development, including single-family housing on small lots as well as multifamily housing and mixed-use developments."

The GMA authorizes subarea plans within the larger scope of comprehensive plans. RCW 36.70A.080(2). In the late 1990s, King County completed a subarea planning process for Fall City. The process resulted in adoption of the 1999 Fall City Subarea Plan (Subarea Plan). KCC 20.12.329. The Subarea Plan implements, is consistent with, and is an element of the K.C. Comp. Plan. KCC 20.08.060. The Rural Town boundaries for Fall City were revised by the subarea plan to eliminate the urban reserve area and significantly reduce the overall Rural Town boundaries. The Subarea Plan policies provide that residential development in Fall City requires adaptation of R-4 zoning:

> Residential development within the revised boundaries of the Rural Town of Fall City should be at densities ranging from one to four dwelling units per acre. All residential land should be zoned R-4 and the zoning code should be amended to eliminate the minimum density requirement and the maximum density option.

The King County Council adopted development regulations implementing the Subarea Plan in June 2000, two weeks after adopting the Subarea Plan. King County Ordinance 13881. The ordinance amended the County's development regulations and reduced the maximum density allowed in the R-4 zone within the Rural Town of Fall City. In other areas of the County, lands with R-4 zoning are allowed to be subdivided at a density of up to eight homes per acre. KCC 21A.12.030(A). For the Rural Town of Fall City, the County Code halves the maximum density in the R-4 zone at four homes per acre. KCC 21A.12.030(B)(22), -.030(B)(23).

III

FCSG argues that both state law and local code required that a plat application be denied if it is not consistent with all elements of a comprehensive plan. As a result, FCSG contends, because King County's hearing examiner could not conclude that the three plat applications were consistent with their interpretation of rural character, the only option was denial of all three applications.

In contrast, the County and Taylor argue that comprehensive plans do not directly control project specific land use decisions, and instead, such projects are reviewed for compliance with the applicable development regulations. They assert approval was appropriate because the hearing examiner concluded that the applications met the applicable development regulations and made appropriate provisions for the subjects enumerated within RCW 58.17.110: to serve the public health, safety, and welfare, and to serve the public use and interest. We agree with the County and Taylor.

A

Judicial review of administrative land use decisions is governed by LUPA. Klineburger v. King County Dep't of Dev. & Env't. Servs. Bldg., 189 Wn. App. 153, 163, 356 P.3d 223 (2015). "[A]n appellate court stands in the shoes of the superior court and reviews the administrative record." Klineburger, 189 Wn. App. at 163. LUPA sets forth six standards for relief from an administrative land use decision. Relevant here, relief will be granted if FCSG establishes:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (d) The land use decision is a clearly erroneous application of the law to the facts;

-14-

RCW 36.70C.130(1).

We review alleged errors of law de novo. Klineburger, 189 Wn. App. at 164. Standard (b) does not require this court "to give complete deference, but rather 'such deference as is due.'" Wash. State Dep't of Transp. v. City of Seattle, 192 Wn. App. 824, 368 P.3d 251 (2016) (quoting Ellensburg Cement Prods., Inc. v. Kittitas County, 179 Wn.2d 737, 753, 317 P.3d 1037 (2014)). Under standard (d), "[a]n application of law to the facts is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Whatcom County Fire Dist. No. 21 v. Whatcom County, 171 Wn.2d 421, 427, 256 P.3d 295 (2011).

Interpretation of statutes and ordinances is a question of law reviewed de novo. Whatcom County Fire Dist. No. 21, 171 Wn.2d at 427.

B

FCSG identifies several state laws and county code provisions that it contends mandate denial of the plat applications. We address each in turn.

1

FCSG first argues that the State subdivision statute, ch. 58.17 RCW, requires denial. Specifically, FCSG contends that RCW 58.17.100 requires the hearing examiner deny a plat application unless it determines the application is in conformance with the comprehensive plan. RCW 58.17.100 provides, in relevant part:

[The hearing examiner][9] shall review all preliminary plats and make recommendations thereon to the city, town or county legislative body to assure conformance of the proposed subdivision to the general purposes of the comprehensive plan and to planning standards and specifications as adopted by the city, town or county. Reports of the [hearing examiner] shall be advisory only.

FCSG ignores that RCW 58.17.100 only addresses "recommendations" by the hearing examiner and "advisory" reports. Nothing in RCW 58.17.100 mandates a hearing examiner deny a plat application that it determines fails to conform to the general purpose of a comprehensive plan.

In contrast, the next provision of the statute, RCW 58.17.110, addresses the factors to be considered, authority to condition, and findings necessary, before a plat application may be approved. After requiring local government inquiry, RCW 58.17.110(2) requires local government make specific findings, including a finding that the public interest will be served:

A proposed subdivision and dedication shall not be approved unless the city, town, or county legislative body[10] makes written findings that: (a) Appropriate provisions are made for the public health, safety, and general welfare and for such open spaces, drainage ways, streets or roads, alleys, other public ways, transit stops, potable water supplies, sanitary wastes, parks and recreation, playgrounds, schools and schoolgrounds and all other relevant facts, including sidewalks and other planning features that assure safe walking conditions for students who only walk to and from school; and (b) the public use and interest will be served by the platting of such subdivision and dedication. If it finds that the proposed subdivision and dedication make such appropriate provisions and that the public use and interest will be served, then the legislative body shall approve the proposed subdivision and dedication.

---

[9] The statute refers to the planning commission or planning agency, but another statute provides counties with the option to substitute a hearing examiner for the planning commission. RCW 36.70.970. The parties do not dispute that the County has done so.

[10] The parties do not dispute that King County has delegated decision making authority over plat applications to the hearing examiner. KCC 20.20.020(3); KCC 20.22.040(Y).

Noticeably missing from RCW 58.17.110(2) is a requirement that the proposed plat application conform with the general purpose of the comprehensive plan.[11]  As this court explained in 1981, the recommendations in RCW 58.17.100 do not carry over into the requirements for plat or subdivision approval in RCW 58.17.110(2):

> Both the Planning Enabling Act and the plats and subdivision statute, RCW 58.17, provide that the planning agency shall review all proposed subdivisions and make recommendations to assure conformance to the "general purposes of the comprehensive plan."  See RCW 36.70.680; RCW 58.17.100.  Such reports, however, are advisory only. . . . Of all the factors that RCW 58.17.110 specifies that the County legislative body must consider before approving a subdivision, no reference is made to compliance with the comprehensive plan.  Instead, the key statutory test is "whether the public interest will be service by the subdivision.

W. Hill Citizens for Controlled Dev. Density v. King County Council, 29 Wn. App. 168, 171-72, 627 P.2d 1002 (1981).

Contrary to FCSG's argument, the hearing examiner fulfilled their delegated duties under RCW 58.17.100 and .110(1) and (2).  While the hearing examiner could not conclude that the three plat applications were consistent with their interpretation of rural character, the hearing examiner recognized that the only tools the legislative authority chose to allow for meeting rural character was maximum densities under the development regulations.  And thus, under RCW 36.70B.030(1), RCW 36.70B.040(1),

---

[11] FCSG argues that RCW 58.17.110(1) requires that the hearing examiner to find that "appropriate provisions for the general welfare," and that the "public interest will be served."  It then cites to KCC 20.08.070, which defines, in part, the comprehensive plan as a "means of promoting the general welfare."  While FCSG is correct that the comprehensive plan provides "a means" of promoting the general welfare, nothing in KCC 20.08.070 states that conformity or consistency with the comprehensive plan is the only means.  Here, the hearing examiner found that plats, as conditioned, served the general welfare and satisfied the public interest based on compliance with the long list of specific topics identified in RCW 58.17.110, as well as compliance with the applicable development regulations.

and Citizens for Mount Vernon, the development regulations controlled.  After a careful review, followed by detailed findings, the hearing examiner ultimately concluded that the proposed subdivisions "will make appropriate provisions for the topical items enumerated within RCW 58.17.110, and will serve the public health, safety, and welfare, and the public use and interest."  Such findings and conclusions satisfy the requirements of the subdivision statute.

2

FCSG next contends that the State's enabling act for hearing examiners supports its argument that under RCW 58.17.100 hearing examiners must deny a plat application that is not consistent with the comprehensive plan.  FCSG points to RCW 36.70.970(3) which requires that final decisions of hearing examiners be in writing and include findings and conclusions that "set forth the manner in which the decision would carry out and conform to the county's comprehensive plan and the county's development regulations."

RCW 36.70.970(3) was adopted in 1977 as part of the pre-GMA Planning Enabling Act of the State of Washington.  LAWS OF 1977, 1st Ex. Sess., ch. 213, § 3.  RCW 36.70.970(3) did not define what it means to "conform" to the county's comprehensive plan.  As discussed above, in the 1995 Local Project Review Act, ch. 36.70B RCW, the legislature explained what "consistency" or "conformity" with a post-GMA comprehensive plan meant.  The legislature stated that RCW 36.70B.030(1) and RCW 36.70B.040(1) were intended to "to establish a mechanism for implementing the provisions of [GMA] regarding compliance, conformity, and consistency of proposed projects with adopted comprehensive plans and development regulations."  LAWS OF

1995, ch. 347, §§ 404, 405 (emphasis added). The legislature explained that where there are adopted development regulations, project conformity with the GMA is determined by the development regulations where they exist, and the comprehensive plan only in the absence of applicable development regulations. RCW 36.70B.030(1); .040(1).

We discern the legislature's intent by applying recognized principles of statutory construction. Wash. State Ass'n of Counties v. State, 199 Wn.2d 1, 12, 502 P.3d 825 (2022). We must give effect to each statute in a way that does not render any language superfluous or meaningless. Wash. State Ass'n of Counties, 199 Wn.2d at 12-13. And, "a general statutory provision must yield to a more specific statutory provision." Wash. State Ass'n of Counties, 199 Wn.2d at 13 (quoting Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd., 182 Wn.2d 342, 356, 340 P.3d 849 (2015)). The specific statute does not invalidate the general statute but will be considered a qualification of or an exception to the general statute. Wash. State Ass'n of Counties, 199 Wn.2d at 13-14.

Here, both statutes provide the procedure a hearing examiner must follow during project review, including plat approval. When read together, the requirement that a hearing examiner find conformity with a comprehensive plan under RCW 36.70.970(3), means that the hearing examiner looks first to the adopted development regulations where they exist.

And to the extent the procedural requirement in RCW 36.70.970(3) conflicts with the procedure in RCW 36.70B.030 and .040, we conclude the newer and more specific statute, RCW 36.70B.030 and .040, controls over RCW 36.70.970(3). This reading

allows RCW 36.70B.970(3) flexibility to provide procedure in the various circumstances under which a hearing examiner may be authorized to act, including circumstances where development regulations are absent and where local regulations require consistency with both a comprehensive plan and regulations. To read RCW 36.70B.970(3) as requiring consistency with a comprehensive plan under all circumstances would render superfluous or meaningless the portions of RCW 36.70B.030 and .040 which state that projects are reviewed for consistency with development regulations or, in the absence of such regulations, the comprehensive plan.

3

FCSG next argues that Code requirements mirror the State's requirement that plat applications be consistent with the comprehensive plan. FCSG first cites to a Code provision addressing the administration of land segregations—KCC 19A.08.060. This provision provides, in relevant part:

> [A]pplications for subdivisions, short subdivisions and binding site plans may be approved, approved with conditions or denied in accordance with the following adopted county and state rules, regulations, plans and policies including, but not limited to:
>
> A. Chapter 43.21C RCW (SEPA);
> B. Chapter 58.17 RCW (Subdivisions);
> C. Chapters 36.70A and 36.70B RCW (Growth Management and Project Review);
> D. K.C.C. Title 9 (Surface Water Management);
> E. K.C.C. Title 13 (Sewer and Water);
> F. K.C.C. Title 14 (Roads and Bridges);
> G. K.C.C. Title 17 (Fire Code);
> H. K.C.C. chapter 20.44 (SEPA);
> I. K.C.C. Title 21A (Zoning);
> J. K.C.C. Title 23 (Code Enforcement);
> K. Administrative rules adopted under K.C.C. chapter 2.98;

        L.  King County board of health rules and regulations;
        M. King County approved utility comprehensive plans;
        N. King County Comprehensive Plan;
        O. Countywide Planning Policies; and
        P. This title.

KCC 19A.080.060. While we agree with FCSG that the K.C. Comp. Plan is one item in the list, it ignores that this Code provision simply identifies rules, regulations, plans and policies that a plat "may be approved, approved with conditions, or denied" under. Nothing in KCC 19A.080.060 mandates denial of a plat if it does not conform with every element or policy of the comprehensive plan.

FCSG next cites a Code provision addressing the function and duties of the hearing examiner—KCC 20.22.180. This provision provides:

> Examiner duties - preliminary plat. For a proposed preliminary plat, the examiner decision shall include findings as to whether:
>     A. Appropriate provisions are made for the public health, safety, and general welfare and for such open spaces, drainage ways, streets or roads, alleys, other public ways, transit stops, potable water supplies, sanitary wastes, parks and recreation, playgrounds, schools, and school grounds, and all other relevant facts, including sidewalks and other planning features that assure safe walking conditions for students who walk to and from school; and
>     B. The public use and interest will be served by platting the subdivision and dedication.

KCC 20.22.180. But again, nothing in this code provision requires conformity with every element or policy of the K.C. Comp. Plan. Instead it mirrors the list of topics that the hearing examiner must review under RCW 58.17.110(1). The hearing examiner conducted this review for each plat application and concluded that the public use and interest would be served.

C

In its reply brief, FCSG recognizes the holding in Citizens for Mount Vernon, 133 Wn.2d at 873, that a comprehensive plan "is a guide and not a document designed for making specific land use decisions, conflicts surrounding the appropriate use are resolved in favor of more specific regulations." But FCSG argues that unlike the situation in Citizens for Mount Vernon, multiple State laws and county code provisions required the hearing examiner to deny the plat applications because they did not conform to the comprehensive plan. FCSG relies primarily on Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 761, 129 P.3d 300 (2006).

Cingular involved a proposal to install a wireless communications facility (WCF) in a rural residential neighborhood. The Thurston County Code allowed WCFs as a special use, but subject to compliance with both "general" and "specific" standards. Cingular, 131 Wn. App. at 762-63. The general standards included that the proposed WCF "shall comply with the Thurston County Comprehensive Plan" and other federal, state, regional and county laws. The specific standards addressed topics such as height, setbacks, colocation with other providers, siting/screening/camouflaging, parking, and noise. Cingular, 131 Wn. App. at 763-64. While the hearing examiner found the WCF could meet the specific standards, they concluded that it conflicted with the comprehensive plan policy to "locate private utility facilities near compatible land uses" and that it would not comply with the purpose and use of the zoning district. Cingular, 131 Wn. App. at 765-66. The Board of County Commissioners and superior court agreed with the hearing examiner's denial of the special use permit. Cingular, 131 Wn. App. at 765-66.

Division Two of this court affirmed, explaining:

To the extent a comprehensive plan prohibits a use that the zoning code permits, the use is permitted. But where, as here, the zoning code itself expressly requires that a proposed use comply with a comprehensive plan, the proposed use must satisfy both the zoning code and the comprehensive plan.

Cingular, 131 Wn. App. at 770.

Largely repeating its earlier arguments, FCSG argues that there are seven provisions of code or statute that require compliance with the comprehensive plan. FCSG's arguments fail; unlike the Thurston County code, none of the provisions cited by FCSG "expressly requires that a proposed use comply with a comprehensive plan." Cingular, 131 Wn. App. at 770.

First, RCW 58.17.100 addresses "recommendations" by the hearing examiner and "advisory" reports. Nothing in RCW 58.17.100 mandates a hearing examiner deny a plat application that it determines fails to conform to the general purpose of a comprehensive plan.

Second, RCW 36.70.970(3) requires a hearing examiner's decision to set forth how the proposal "conforms" to the comprehensive plan. When read with RCW 36.70B.030(1) and .040(1), conformity is determined by compliance with the applicable development regulations where they exist. RCW 36.70.970(3) does not "expressly require" compliance with the comprehensive plan. See also RCW 36.70.340 ("In no case shall the comprehensive plan, . . . be considered to be other than in such form as to serve as a guide to the later development and adoption of official controls"); Woods, 162 Wn.2d at 612-14 ("a proposed land use decision must only generally conform, rather than strictly conform, to the comprehensive plan").

-23-

Third, KCC 20.12.010 states in relevant part "The Comprehensive Plan shall be the principal planning document for the orderly physical development of the county and shall be used to guide subarea plans, . . . development regulations and land development decisions."  On its face, KCC 20.12.010 requires only that the comprehensive plan guide land development decisions such as plat decisions.  It does not expressly require plat decisions comply with the comprehensive plan.

Fourth, KCC 20.22.030 grants the hearing examiner discretion to "grant, remand, or deny the application . . . and may include any conditions, modifications, and restrictions necessary to carry out applicable laws, regulations, and adopted policies."  KCC 20.22.030 is discretionary, it does not expressly require a plat application comply with the comprehensive plan.

Fifth, KCC 20.22.180 requires the hearing examiner to find that a plat application makes appropriate provisions for the public health, safety, and general welfare, and that the public use and interest will be served by approving the plat.  Nothing in KCC 20.22.180 expressly requires compliance with the comprehensive plan.

Sixth, KCC 19A.080.060 grants the hearing examiner discretion to approve, approve with conditions, or deny a plat application based on a list of 16 laws and policies, including the comprehensive plan.  Nothing in KCC 19A.080.060 expressly requires denial of a plat application if it does not comply with every element or policy of the comprehensive plan.

Seventh, KCC 20.08.070, defines the comprehensive plan to mean:

the principles, goals, objectives, policies and criteria approved by the council to meet the requirements of the Washington State Growth Management Act, and,

A. As a beginning step in planning for the development of the county;
B. As the means for coordinating county programs and services;
C. As policy direction for official regulations and controls; and
D. As a means for establishing an urban/rural boundary;
E. As a means of promoting the general welfare.

While this code provision recognizes the comprehensive plan as a "means of promoting the general welfare," nothing in this provision expressly requires that plat applications comply with the comprehensive plan.

In summary, and in contrast with Cingular Wireless, FCSG fails to demonstrated that there is an express requirement that plat applications must comply with the comprehensive plan in addition to development regulations.

We conclude that while the hearing examiner was within their authority to determine the plat applications did not protect what they interpreted as the rural character, the hearing examiner did not err in approving the plat applications. The hearing examiner correctly followed Washington's land use statutes and longstanding jurisprudence in concluding that the plat applications should be approved.

We affirm.

_Mann, J._

WE CONCUR:

_Díaz, J._

_, ACJ_